IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>ALBERTO MENDOZA and ELIDORO SALGADO-AGUILAR,<br>Defendant. | REPORT AND RECOMMENDATION<br><br>Case No. 1:10-cr-152 DB<br><br>District Judge Dee Benson<br><br>Magistrate Judge Brooke Wells |

This matter is before the undersigned pursuant to a referral from District Judge Dee Benson.[1] Presently before the Court are two motions to suppress, one filed by Defendant Alberto Mendoza and another filed by Defendant Elidoro Salgado-Aguilar.[2] Defendants were travelling together in a vehicle that was stopped on November 15, 2010 and both motions address this same stop and subsequent detention. Defendants filed a joint memorandum in support of their motions.[3]

An evidentiary hearing was held on April 25, 2011 and closing arguments were heard on August 26, 2011. Don Brown represented the United States, Fred Metos represented Alberto Mendoza, and David Shapiro represented Eliodoro Salgado-Aguilar. The Court has reviewed the evidence submitted at the evidentiary hearing, the parties memoranda, relevant case law, and the video tape of the stop. The Court now enters the following recommending that Defendants' motions be granted.

---

[1] Docket no. 27.

[2] Docket nos. 22 and 23.

[3] *See* docket no. 45.

FINDINGS OF FACT

On November 15, 2010 at approximately 11:30 p.m., Utah Highway Patrol Trooper James Martin[4] was on patrol on Interstate Highways 84 and 15 in Box Elder County Utah. Earlier that evening Trooper Martin had been advised by Trooper Jensen that "there was a vehicle traveling - - coming from I-84 that possibly could have contraband in it." (Transcript of April 25, 2011 Evidentiary Hearing (hereinafter Tr.) at 8.) The description of the vehicle given to Martin was that it would have either Washington or Utah license plates, was a passenger vehicle, and that it would be travelling eastbound on I-84. (Tr. 8, 18)

Martin pulled into the median about a half mile west of Tremonton, Utah. There he waited looking for car headlights since according to his testimony, most of the vehicles at 11:00 or 11:30 "at night are semi trucks." (Tr. at 19) He waited a short time and pulled out to follow the first passenger vehicle that came by. The speed limit on that part of the interstate is 75 miles per hour and after pulling out of the median it took Martin less than a minute to catch up to the vehicle. (Tr. at 27) Martin observed that the passenger vehicle was a Dodge Durango, a sport utility vehicle, which had Washington license plates.

Martin followed the vehicle for three miles. At the point where the interstate makes a turn he observed the vehicle cross the fog line on the right side of the road. The vehicle crossed the line for a couple of seconds before it crossed back into the right lane. (Tr. at 8, 28, 29) In describing the violation, Martin testified that as the vehicle went through the arc of the turn it crossed the fog line on the right side of the vehicle as if taking the turn a little too early. (Tr. at 30) There is no lighting in this area of the freeway. While following the vehicle Martin did not observe any other violations of the traffic laws.

---

[4] The transcript from the evidentiary hearing lists the troopers name as James Mont. During final arguments, however, the Government clarified that the trooper's name is James Martin.

Martin decided to pull the vehicle over and activated his overhead emergency lights which automatically turned on the video camera in Martin's patrol car. Shortly thereafter, the vehicle pulled over and stopped. The weather that night was a rain snow mix.[5] Martin testified that he often stops vehicles for failing to operate in one lane of travel because at that time of night the driver could be drowsy or intoxicated. (Tr. at 32)

Martin approached the vehicle on the passenger side. He observed that the passenger, Alberto Mendoza, was sleeping. As he explained to the driver, Elidoro Salgado-Aguilar, why he stopped the vehicle, Mendoza woke up startled. (Tr. at 10) Martin asked for license, registration, and insurance information.

While waiting for the information Martin observed "brand new air fresheners hanging from the . . . steering column." (Tr. at 32) Martin testified, however, that he did not detect any odor from the air fresheners. (Tr. at 35, 36) Martin also noticed numerous crucifixes hanging from the center mirror and when the glove box was opened to retrieve the requested documentation he saw two cell phones. (Tr. at 32)

Salgado-Aguilar handed the Trooper a Washington driver's license and Mendoza provided a Mexican driver's license as identification. Upon receiving the registration Martin noticed that the vehicle was not registered to either Salgado-Aguilar or Mendoza. Martin testified that when he asked Defendants about the registration it appeared that Mendoza tried to read the name on the registration rather than provide a natural response. (Tr. at 11) Mendoza did, however, give the correct name of the woman listed on the registration. And later, Martin learned from Trooper Jensen that the woman's name on the registration was Mendoza's wife. (Tr. at 33)

---

[5] *See* Video tape of the stop.

Martin also noticed the insurance on the vehicle had been issued to Salgado-Aguilar the same day and was only approximately eleven and a half hours old. (Tr. at 12). When it was checked, Martin found that the insurance was valid and did cover Salgado-Aguilar's operation of the vehicle.

Defendants told Martin they were travelling from Yakima, Washington to Salt Lake City and that they would be in Salt Lake City for two or three days to help Mendoza's mother-in-law move to Washington. (Tr. at 10-13) Martin did not see any luggage or clothing in the vehicle.

After getting the documents and information from the defendants Martin returned to his patrol car. The video of the stop shows that while Martin was returning to his patrol car at least two other passenger vehicles passed on the freeway. While reviewing the recording the Court also observed other passenger vehicles travelling on the interstate. So, while perhaps not as common as semi-trucks at this time of night, the Court finds the video of the stop demonstrates that passenger vehicles are more prevalent than indicated by Martin's testimony.

Martin immediately called Trooper Jensen when he returned to his patrol car because he thought this was the passenger vehicle Jensen had warned him about earlier. Martin testified that he also called Jensen because he had a drug detection dog. (Tr. at 35) After calling Jensen, Martin ran checks on the driver's license, the vehicle, and determined if there were any outstanding warrants for Defendants. (Tr. at 12-13) The driver's license was valid, there were no outstanding warrants for the occupants, and the vehicle was not listed as stolen.

Jensen arrived within five minutes of being called. After he arrived he spoke with the defendants and then the defendants exited the vehicle and waited in front of it. Kuda, Trooper Jensen's dog, reacted to the car and a search was conducted. Based on the video of the stop, Kuda was used twice and indicated on the door seams of the vehicle. The troopers conducted a

search and found drugs. Approximately twenty minutes passed from the time that Jensen was requested to bring the dog to the scent to the time that the search of the vehicle was completed.

CONCLUSIONS OF LAW

Both Defendants challenge the validity of the initial traffic stop. They also challenge the scope of the detention following the stop.

In the Tenth Circuit a traffic stop is a seizure for Fourth Amendment purposes and is analyzed under the principles set forth in *Terry v. Ohio*.[6] Thus, the Court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[7]

I. The Initial Stop

As discussed further, the Court finds that the traffic stop was not justified at its inception. Accordingly, the Government has failed to satisfy the first prong of the *Terry* analysis.

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[8] Whether "the officer may have had other subjective motives for stopping the vehicle"[9] is irrelevant. The government bears the burden of proving the reasonableness of the officer's suspicion.[10]

---

[6] 392 U.S. 1 (1968). *See United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc), *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).

[7] *Terry*, 392 U.S. at 20.

[8] *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995), *cert denied*, 518 U.S. 1007 (1996).

[9] *Id.*

[10] *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998).

The initial question here centers on whether the Defendants committed a traffic violation by crossing the fog line on the right hand side of the road entering into the emergency lane for a few seconds. And, more specifically, did Trooper Martin's observation of the Defendants' vehicle crossing the line provide an objective legal basis for pulling the vehicle over.

Defendants first argue that the stop was not justified at its inception because crossing over the fog line for a couple of seconds—under the conditions found in this case—did not constitute a traffic violation. As noted above, Martin stopped Defendants' vehicle because it failed to operate in one lane of travel. The Government asserts that an officer may stop a vehicle and investigate further or issue a citation for "any one of the multitude of applicable traffic and equipment regulations."[11] Specifically, the Government argues that Defendants violated Utah's lane travel requirements.

The lane travel requirements for vehicles in Utah are set forth in Utah Code Ann. § 41-6-710 (2010).[12] This statute provides in part:

> On a roadway divided into two or more clearly marked lanes for traffic the following provisions apply:
>   (1) A person operating a vehicle:
>     (a) shall keep the vehicle as nearly as practical entirely within a single lane;

The cases that have analyzed this and other similar statues have focused on the "as nearly as practical" language[13] and have engaged in a "fact-specific inquiry into the particular circumstances present during the incident in question in order to determine whether the driver

---

[11] *Delaware v. Prouse*, 440 U.S. 648, 661 (1979).

[12] This section was formerly numbered 41-6-61.

[13] *See generally*, *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996); *United States v. Ozbirn*, 189 F.3d 1194 (10th Cir.1999); *United States v. Zabalza*, 346 F.3d 1255 (10th Cir. 2003); *United States v. Alvarado*, 430 F.3d 1305 (10th Cir. 2005); *United States v. Valenzuela*, 494 F.3d 886 (10th Cir. 2007).

could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway."[14]

Defendants cite to several cases arguing that their drift into the fog lane did not justify Martin's stop.[15] Defendants primarily rely on *United States v. Gregory*,[16] and *State v. Bello*,[17] a decision from the Utah Court of Appeals. In *Gregory*, the Tenth Circuit interpreted the "as nearly as practical" language found in Utah's lane travel statute and held, under the circumstances of that case, that a driver's brief drift outside his lane of traffic into an emergency lane did not amount to a violation of Utah law sufficient to justify a traffic stop. The officer in *Gregory* stopped a truck after it "briefly crossed into the right shoulder emergency lane" where "[t]he road was winding, the terrain mountainous and the weather condition was windy."[18] The court determined that given these conditions, "any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity."[19] Thus the single incident of moving into the right shoulder did not constitute a violation of Utah law.

In *Bello*, which was cited to by the Tenth Circuit in *Gregory*, the Utah Court of Appeals held that a single instance of weaving into another lane did not violate Utah's lane travel statue. In reaching this holding the Court of Appeals pointed to the following facts: it was extremely windy; Bellow's truck had a camper shell that made it more exposed to the wind which increased

---

[14] *Alvarado*, 494 F.3d at 1309.

[15] *See United States v. Gregory*, 79 F.3d 973; *United States v. Ozbirn*, 189 F.3d 1194; *United States v. Alvarado*, 430 F.3d 1305; *United States v. Zabalza*, 346 F.3d 1255; *United States v. Valenzuela*, 494 F.3d 886; *State v. Bello*, 871 P.2d 584 (Ut.App.1994).

[16] 79 F.3d 973 (10th Cir. 1996).

[17] 871 P.2d 584 (Ut.App.1994).

[18] 79 F.3d at 978.

[19] *Id.*

the likelihood of weaving; and the officer had not seen any other weaving after the first instance while following the truck for two miles.[20]

Subsequent to the decision in *Gregory*, the Tenth Circuit has "emphasized that that case does not 'stand[ ] for the proposition that a single instance of drifting onto the shoulder can never be a violation of a traffic statute like section [41-6-61(1) ].'"[21] Rather, each case must be objectively analyzed taking into account all the surrounding facts and circumstances to determine whether the officer had a reasonable suspicion that a violation of Utah's statute occurred.[22] In following this approach the Tenth Circuit has distinguished *Gregory* in a number of cases based upon the factual circumstances.[23]

Here, there are conditions which the Court finds fall within the reasoning found in *Gregory*. The road was unlit, it was night, and the video recording of the stop indicates that it was raining and snowing. The alleged violation occurred as the vehicle in the right hand lane of the freeway rounded a right hand turn by "essentially taking the turn a little too early" as testified to by Trooper Martin. The trooper followed the car for three miles without observing any other violations. And finally, the movement into the right hand lane was brief and did not pose a risk of collision with other vehicles.

Martin testified that it was his customary practice to stop vehicles that violate lane restrictions at that time of night because the driver could be drowsy or drunk. (Tr 32) Sometimes

---

[20] 871 P.2d at 587.

[21] *Alvarado*, 430 F.3d at 1308 (quoting *United States v. Cline*, 349 F.3d 1276, 1287).

[22] *See id.*; *Ozbirn*, 189 F.3d at 1198.

[23] *See Ozbrin*, 189 F.3d at 1198 (distinguishing *Gregory* based upon the ideal weather conditions where the road was smooth and dry); *Alvarado*, 430 F.3d at 1309 (finding *Gregory* distinguishable because "there were no adverse weather or road conditions" making it impractical to operate a vehicle within one lane); *Zabalza*, 346 F.3d at 1258 (concluding that crossing the center line twice created a reasonable suspicion that the defendant had created a traffic violation); *Valenzuela*, 494 F.3d at 889 (distinguishing *Gregory* based on a number of factors: defendant's vehicle did not move toward the right shoulder but into another lane of oncoming traffic; defendant was travelling along a four-lane city street; and a lack of adverse conditions contributing to the lane drift).

Martin would wait for the vehicle to drift a second time. In this instance, however, Martin did not see the vehicle drift again before pulling it over.

The court is not persuaded that Martin's "customary practice" provides a basis for stopping the vehicle in this instance. While driver safety and the safety of others on the highway is a valid concern, the evidence in this case indicates the alleged violation did not occur where others were at risk and it was at a place in the road where a slight crossing into the fog lane is not that unexpected. Martin testified that the vehicle crossed the line where I-84 merges into I-15. There is a right-hand bend where the highways merge and then the road straightens out. It was during this "right-hand arc" where the vehicle crossed the line because the driver took the turn a little too early.

Based upon the facts of the case, the Court asked the Government to distinguish *Gregory* during final arguments. (Transcript of August 26, 2011 Final Arguments (hereinafter Tr2.) at 6.) The Government argued that *Gregory* involved a moving van that was more susceptible to movement than the vehicle in this case. (Tr2. 6-7) The vehicle here was a Dodge Durango, a sport utility vehicle that is larger than a passenger car but smaller than a moving van. This difference in size, however, is not persuasive to the Court and the Government offered no other distinguishing characteristics between this case and *Gregory* during final argument or in its memorandum.

Accordingly, given the nature of the roadway, the lack of lighting, the weather conditions, the driving pattern of the Defendants and the fact that the vehicle did not pose a risk of danger to any other vehicles, the Court concludes the vehicle's movement into the right hand fog lane did not amount to a violation of Utah law sufficient to justify a traffic stop. In essence

the Court finds this case analogous to *Gregory*.[24] Having reached this conclusion, the Court now turns to whether or not the officer had a reasonable suspicion of illegal activity that justifies the stop.

The standard for evaluating whether an officer has reasonable suspicion of illegal activity is an objective one.[25] The determination is to be made on the totality of the circumstances.[26] By definition, the totality of the circumstances includes all circumstances known to the officer at the time, as well as reasonable inferences and conclusions that may be drawn by the officer. Moreover, in determining reasonableness, the officer's conduct should be viewed with "'common sense' considering 'ordinary human experience.'"[27] And, with an approach "intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."[28]

In the instant case Trooper Martin testified that he was advised by Trooper Johnson that "there was a vehicle traveling - - coming from I-84 that possibly could have contraband in it." (Tr. 8) There is nothing before the Court indicating from whom or where Trooper Johnson received this information. As such, this information is considered an anonymous tip.

---

[24] During final arguments Mr. Shapiro, counsel for Mr. Salgado-Aguilar, offered another explanation for the vehicle drifting into the right hand fog lane—the sudden approach of Trooper Martin's car which may have distracted Mr. Salgado-Aguilar causing him to briefly drive into the fog lane. (Tr2. 12-13). This explanation is plausible and appealing, however, the Court finds it is unnecessary in reaching its conclusion that the circumstances in this case are sufficiently similar to *Gregory*.

[25] *See. e.g., United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir.1997).

[26] *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998).

[27] *Villa-Chaparro*, 115 F.3d at 801 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

[28] *Id*. (quoting *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir. 1995)); see also *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

An anonymous tip by itself seldom can provide the reasonable suspicion necessary for a *Terry* stop.[29] Rather, it needs to be corroborated by independent police work and be sufficiently detailed. In essence, "[t]he officer [making a Terry stop] . . . must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'"[30]

Based upon the facts of this case, the Court concludes the anonymous tip was lacking in sufficient detail to provide a basis for the stop. Martin had the following information: an eastbound vehicle with either Utah or Washington license plates "coming from I-84 that <u>possibly could</u> have contraband in it." (Tr 8 emphasis added) This description is not only vague, but is uncertain even as to the presence of contraband in the vehicle. Such a description could describe a number of different eastbound vehicles travelling on the interstate that night. Martin testified there were very few privately owned passenger vehicles in that area of the interstate at that time of night. So, according to the Government, the fact that the Defendants were in a passenger vehicle provided a basis for the stop. As mentioned above, however, Martin's testimony is undermined by the video of the stop which shows a number of other passenger vehicles on the interstate at that time of night. Unlike other instances where courts have found an anonymous tip to be sufficiently detailed,[31] here the tip is lacking in sufficient detail to provide a basis for a stop. Further, the information was not corroborated by independent police work. Therefore the

---

[29] *See Illinois v. Gates*, 462 U.S. 213, 237 (1983); *Alabama v. White*, 496 U.S. 325, 328-29 (1990).

[30] *White*, 496 U.S. at 329 (quoting *Terry*, 392 U.S. at 27).

[31] *See for e.g., White*, 496 U.S. at 329-30 (finding an anonymous telephone tip that a defendant would be leaving a particular apartment, at a particular time, in a particular vehicle, and would be travelling to a named motel, and that she would be in possession of cocaine, which was corroborated by independent police work, was sufficiently reliable to provide a reasonable suspicion to make investigatory stop).

Court concludes the tip was not sufficiently reliable to provide a reasonable suspicion to make an investigatory stop.[32]

Accordingly, the Court concludes there was no basis to justify the initial stop of the vehicle and therefore recommends Defendants' Motions to Suppress be GRANTED. However, even if this Court were to conclude the initial stop was justified, the Government must still show that the continued detention of the Defendants was reasonable given the totality of the circumstances.[33]

II. Scope of the Detention Following the Stop

As discussed below, the Court finds that the detention of the Defendants exceeded the scope of the initial stop. Specifically, the Court finds that Trooper Martin did not have a reasonable articulable suspicion of criminal activity that justified the continued detention of the Defendants. Accordingly, the Court concludes that the detention of the Defendants beyond the time necessary to make sure the driver was not impaired or drowsy, and to check the license and vehicle registration on the car was unlawful.

The Fourth Amendment places limitations on officers conducting traffic stops. The Tenth Circuit has stated that an "investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification."[34] Generally, in a routine traffic stop, an officer may detain persons for only as long as it takes to request an operator's license and vehicle

---

[32] *See Florida v. J.L.*, 529 U.S. 266, 273-74 (2000) (holding that anonymous tip lacked sufficient indicia of reliability to establish reasonable suspicion for *Terry* investigatory stop).

[33] *See Terry*, 392 U.S. at 20.

[34] *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).

registration, run required computer checks, and issue a citation.[35] It is undisputed that "an officer may ask questions relating to the reason for the stop,"[36] or ask, without any reasonable suspicion, whether the vehicle has any loaded weapons in it.[37] However, "'[w]hen the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'"[38]

An extension of the usual traffic stop is permissible in two circumstances. "First, if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, the officer may detain the driver for questioning unrelated to the purpose of the initial traffic stop. Second, if the traffic stop has become a consensual encounter, the officer may continue to question the driver."[39]

Here, the encounter between Trooper Martin and Defendants was not consensual. The Tenth Circuit has held that if the officer does not return the person's documentation (for example, driver's license and registration), the detention is not over and the encounter is not consensual.[40] The evidence before the Court indicates the documentation was not returned to the Defendants. Accordingly, the Court looks to whether or not Trooper Martin had a reasonable suspicion that a crime was occurring. The government bears the burden of showing that the seizure of Mr.

---

[35] *See e.g.*, *United States v. Martinez*, 983 F.2d 968, 974 (10th Cir. 1992) (citing *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir 1988), overruled on other grounds; *United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995)).

[36] *United States v. Holt*, 264 F.3d 1214, 1221 (10th Cir. 2001) (en banc).

[37] *Id.* at 1217-18.

[38] *Wood*, 106 F.3d at 945 (quoting *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996); *see also United States v.Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988) (describing what an officer may do in a routine traffic stop).

[39] *Untied States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001); *see also United States v. Oliver*, 363 F.3d 1061, 1066 (10th Cir. 2004) ("When questioning prolongs the detention, the prolongation in itself constitutes a seizure under the Fourth Amendment, so we have repeatedly held that the questioning must be supported by at least reasonable suspicion.").

[40] *See United States v. Mendez*, 188 F.3d 1426, 1430-31 (10th Cir. 1997).

Mendoza and Mr. Salgado-Aguilar "was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."[41]

The Government contends the following factors, as testified to by Martin, justified further detention of the Defendants to allow Trooper Jensen's dog to conduct a search of the vehicle: 1) the anonymous tip that a passenger vehicle with either Washington or Utah license plates travelling on I-84 might have contraband in it; 2) Defendants' vehicle was a passenger vehicle with Washington plates on it; 3) numerous brand new air fresheners hanging from the vehicle's steering column; 4) crucifixes hanging from the center mirror; 5) two cell phones in the glove box; 6) the insurance had just been issued to Mr. Salgado-Aguilar, the driver of the vehicle, earlier that day; 7) problems with proof of ownership or authority to operate the vehicle; and 8) no luggage in the vehicle despite plans to visit Mr. Mendoza's mother-in-law in Salt Lake City and help her move to Washington. The Court considers each of these in turn and also in their totality,[42] and "accords deference to an officer's ability to distinguish between innocent and suspicious actions." [43]

As discussed previously, the anonymous tip could describe a number of different vehicles traveling on the interstate that night and is of little weight. So too, is the fact that Defendants' vehicle was a passenger vehicle with Washington plates. As demonstrated by the video of the stop, passenger vehicles travelling on the interstate at that time of night were much more common than testified to by Martin.

---

[41] *Florida v. Royer*, 460 U.S. 491, 500 (1983), *quoted in United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994).

[42] *See, Villa-Chaparro*, 115 F.3d at 802; *Salzano*, 158 F.3d at 1111; *United States v. Simpson*, 609 F.3d 1140, 1146 ("As courts have often repeated, the existence of objectively reasonable suspicion of illegal activity 'does not depend upon any one factor, but on the totality of the circumstances.'") (citation omitted).

[43] *Simpson*, 609 F.3d at 1146.

Next, the Tenth Circuit has held that the scent of an air freshener is properly considered as a factor in the probable cause analysis.[44] Martin testified that although he saw numerous "brand new" air fresheners he did not smell any odors from the air fresheners and there was no strong smell of any other known masking agents. The cases citing to the use of masking agents, which are used to hide the smell of contraband, have focused on the smell or odor of such agents as evidence of suspicious criminal activity. Hence, the presence of air fresheners in this case that do not emit any odors is of little or no weight in the probable cause analysis.

Fourth, Martin testified the presence of crucifixes constituted a religious disclaimer. (Tr. 34) He surmised that the purpose of these crucifixes was so the occupants could pass themselves off as good religious people. This factor is susceptible to many various interpretations and is a very weak indicator of criminal activity.[45]

Fifth, Martin claimed that the presence of two cellular telephones in the glove compartment was suspicious and indicative of drug activity. As noted by the Sixth Circuit in *Townsend*, cellular telephones are much more common today than they were in the early 1990s, "when they were considered 'tools of the drug trade.'"[46] Two cell phones in one car with two occupants is not an odd occurrence at all in modern society. It is not uncommon to see two occupants in a vehicle talking at the same time on two different cell phones while travelling down the interstate. In fact, due to safety concerns, some states and many countries have placed restrictions and bans upon certain types of cell phone activities while driving. This factor, therefore, is at best an extremely weak indicator of criminal activity.

---

[44] *See United States v. West*, 219 F.3d 1171, 1178-79 (10th Cir. 2000); *United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir. 1997).

[45] *See, e.g., United States v. Townsend*, 305 F.3d 537, 544 (6th Cir. 2002) (finding the presence of a bible a very weak indicator of criminal activity).

[46] *Id.* at 544 (quoting *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1993)).

Next, the Government points to the fact that the driver of the vehicle, Mr. Salgado-Aguilar, obtained insurance on the vehicle earlier on the same day it was pulled over. The Government also cites to the fact that neither Defendant had "proof of ownership or authority to drive the vehicle."[47]

As noted by the Tenth Circuit, "the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many of our cases upholding further questioning."[48] Thus, when a driver has no valid registration, gives information inconsistent with a vehicle's registration, or gives statements inconsistent with an officer's observations, courts have upheld further questioning.[49]

In the instant matter, Mr. Salgado-Aguilar produced proof of insurance authorizing him to operate the vehicle. Although the insurance was issued that same day, it nevertheless provided proof that he had authority to operate the vehicle. Trooper Martin testified that when handed the registration it appeared that Mr. Mendoza tried to read the name on the registration rather than provide a natural response. Mr. Mendoza, however, did provide the correct information, and later Martin learned that the vehicle was registered to his wife.

Initially, the recently issued insurance and the vehicle registration may have caused some concern and provided a basis for further questioning and clarification. When both were shown to be correct and the vehicle was not stolen, however, Martin should have allowed the occupants to

---

[47] Gov. response to mtn to suppress p. 4.

[48] *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998); *see United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994) ("a defining characteristic of our traffic stop jurisprudence is the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen").

[49] *See, e.g.*, *Hunnicutt*, 135 F.3d at 1349 (citing to the fact that the registered owner's name was different than the name defendant gave as the person he purchased the vehicle from as supporting a reasonable suspicion of criminal activity); *Villa-Chaparro*, 115 F.3d at 799 (citing to inconsistent statements made about the vehicle owner and the registered owner as supporting a reasonable suspicion of criminal activity); *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991) *cert. den.* 112 S. Ct. 230 (1991) (finding that inconsistent statements made by the defendant supported a reasonable suspicion of criminal activity).

leave. Further detention beyond this point was beyond the scope of the initial stop.[50] Thus, while perhaps suspicious at first, after verification these factors do not provide much weight to the reasonable suspicion analysis and did not provide a basis to call Trooper Johnson and his dog Kuda to investigate further.

Eighth, Trooper Martin testified to the lack of clothing or luggage in the vehicle despite Defendants' story that they were going to Salt Lake City for a couple of days to help Mendoza's mother-in-law move to Washington. The Court finds this factor to carry the most weight of criminal activity. However, this fact alone, and even in concert with the other factors cited to by the Government, does not rise to a level of suspicious activity warranting further detention. The planned stay in Salt Lake City was going to be short, so not a lot of clothing would be necessary. Courts have noted that short stays do not necessitate having lots of luggage and therefore have dismissed this as a suspicious factor.[51] Further, the Defendants were also going to help Mr. Mendoza's mother-in-law move, so space may have been at a premium requiring the Defendants to not bring much luggage with them. Finally, there were no inconsistencies in the Defendants' story that could give rise to a suspicion of criminal activity. Based on these facts, the Court therefore finds this factor to be a relatively weak indicator of criminal activity.

Despite the individual weakness of these factors, the Government argues that taken together they support the continued detention of the Defendants. The Court disagrees. Most of the factors cited to by the Government are weak indicators of criminal activity and became even weaker after further investigation by the Trooper. Added together they do not rise to a level justifying the continued detention of the Defendants. And, when considered in the context of a

---

[50] *See Wood*, 106 F.3d at 945; *Martinez*, 983 F.2d at 974; *Botero-Ospina*, 71 F.3d at 783.

[51] *See, e.g.*, *United States v. Wald*, 216 F.3d 1222, (10th Cir. 2000) (noting presence of only two pieces of luggage for a weekend road trip to Las Vegas not suspicious).

vague anonymous tip that provided little specific information, they do little to add to the reasonable suspicion of criminal activity. In short, it appears that Trooper Martin was acting on an "inchoate and unparticularized suspicion or hunch"[52] after pulling over the first passenger vehicle he saw on the interstate that night. This does not meet the Government's burden concerning the stop and subsequent seizure of contraband.[53]

## RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that Defendants' motions to suppress be GRANTED. Copies of the foregoing report and recommendation are being mailed to all parties who are hereby notified of their right to object. Any objection must be filed within 14 days after being served with a copy.[54] Failure to object may constitute a waiver of objections upon subsequent review.

DATED this 20 September 2011.

Brooke C. Wells
United States Magistrate Judge

---

[52] *Terry*, 392 U.S. at 27; *see also White* 496 U.S. at 329.

[53] *See Royer*, 460 U.S. at 500.

[54] *See* Fed. R. Civ. P. 72(b)(2).